UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

S.C. JOHNSON & SON, INC.,
a Wisconsin Corporation
1525 Howe Street
Racine, WI 53403

                                    Plaintiff,

              v.                                        Case No. _____

HENKEL CORPORATION,
One Henkel Way
Rocky Hill, CT 06067

                                    Defendant.

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff S.C. Johnson & Son, Inc. ("SCJ") is a longstanding participant in the market for plug-in scented oil ("PISO") products. PISO products consist of reusable warmers that heat scented oils contained within single-use fragrance refill bottles, causing them to emit fragrance when plugged in. SCJ's Glade® PlugIns® products are one of the leading brands in the PISO market.

Defendant Henkel Corporation ("Defendant") is a very recent entrant into the PISO market, having recently introduced its own scented oil products under the brand name Renuzit®. In advertising its Renuzit® Plug-In Refills, Defendant has created a campaign based on the idea of "universal fit" – essentially, that Renuzit® Plug-In Refills can be used not only with Defendant's own warmers, but also with the warmers of other manufacturers – including SCJ. Even the product packaging makes this claim, referencing SCJ's Glade® warmers by name:



*Renuzit Sensitive Scents Pure White Pear & Lavender Refill*, AMAZON.COM, *available at*

https://tinyurl.com/y57zaxn2 (go to www.amazon.com; then search for "renuzit sensitive scents

pure white pear and lavender refill") (last visited March 13, 2019).  Defendant relies on this

"universal fit" to encourage the customers of its competitors to try one of Defendant's fragrances,

rather than purchasing a refill from the company that manufactured the warmer.  Indeed, one of

Defendant's video ads states: "Renuzit Scented Oils give you the freedom to find a new fragrance

you love, without the extra investment of a new warmer."  It goes on to claim that its refills "fit

three of the top brands" and mentions Glade® by name.

        But Defendant's claims of "universal fit" are false.  Defendant's Renuzit® Plug-In Refills

do *not* fit into any versions of SCJ's Glade® warmers sold since 2012 – at least not so that they

actually function. While Renuzit® Plug-In Refills *can* be forcibly inserted into some older Glade® warmers, the wick of the refill bottle does not align with the ceramic heater within the warmer. This means that the heat transfer to the oil will be severely limited– which, of course, means that, when loaded with a Renuzit® Plug-In Refill, a Glade® warmer will emit limited or no fragrance. And when it comes to the current version of the Glade® warmer, the Renuzit® Plug-In Refill does not fit at all; trying to physically force it to "catch" will likely damage either the warmer or the refill bottle and could cause the unit to fail or the scented oil to leak. By misleading SCJ's customers into purchasing a Renuzit® Plug-In Refill, then, Defendant is damaging SCJ both financially and reputationally.

Injuries under the Lanham Act are presumed irreparable. This case is no exception. And, particularly in light of the strength of SCJ's claims on the merits, the balance of harms and the public interest alike weigh in favor of preventing Defendant's misleading advertising from effecting further harm while the parties litigate this matter to its conclusion. SCJ thus respectfully requests that, until this case can be resolved, the Court enter a temporary restraining order and preliminary injunction in order to prohibit Defendant from continuing to disseminate its false advertisements.

## FACTS[1]

SCJ is a Wisconsin corporation and a family-owned company. (Compl. ¶¶ 2, 7.) It is one of the leading manufacturers of household cleaning products and products for home storage, air care, pest control, and shoe care. (Compl. ¶ 7.) Relevant to this case, it is also one of the top manufacturers in the PISO market, having offered its Glade® PlugIns® for sale for many years.

---

[1] SCJ offers only a broad overview of the facts in this section; more specific facts will be discussed as they become relevant to the analysis of the claims.

(Aff. of Tara Kowalski ("Kowalski Aff.") ¶¶ 2-3; Compl. ¶¶ 9-10.)  Glade® products work in substantially the same manner as standard PISO products: they consist of a reusable warmer and a single-use bottle of scented oil.  (Kowalski Aff. ¶ 3.)  The consumer inserts the fragrance bottle into the warmer so that the wick of the bottle is aligned with a ceramic heating element.  When the warmer is plugged in, the ceramic heater warms the oil in the wick, causing the product to emit fragrance.  (Kowalski Aff. ¶ 3.)

Unlike SCJ, Defendant is a very recent re-entrant into the PISO market, having been absent from that market since sometime before 2012.  (Compl. ¶ 18.)  Approximately two months ago, for the first time in years, Defendant began offering for sale its own PISO products under the brand name "Renuzit®."  (Compl. ¶ 18; Kowalski Aff. ¶ 9.)  Defendant does sell its own reusable warmers; however, it also sells fragrance bottle refills, called "Renuzit® Plug-In Refills," without a warmer included in the package.  (Compl. ¶¶ 19-20; *see* Kowalski Aff. ¶ 8.)

Generally speaking, a PISO warmer of a particular brand functions best with fragrance bottle refills of that same brand.  (Kowalski Aff. ¶ 7; Compl. ¶ 23.)  However, as a recent entrant to the market, Defendant has created an ad campaign intended to divert sales from more longstanding participants in the market without requiring their customers to purchase a new warmer.  (Compl. ¶ 24; *see* Kowalski Aff. ¶ 17.)  Defendant's campaign claims that its Renuzit® Plug-In Refills are "universal refills" or have a "universal fit" – that is, that they can be used in conjunction not only with Renuzit® warmers but also with warmers from other leading manufacturers.  (Kowalski Aff. ¶ 10; Compl. ¶ 24.)  Its ads specifically mention Glade® by name and seek to convince consumers who would otherwise purchase a Glade® PlugIns® fragrance bottle refill to replace it with a Renuzit® Plug-In Refill instead.  (Kowalski Aff. ¶¶ 10, 17; Compl. ¶¶ 24-28.)

For example, a video ad available on Defendant's Renuzit® PISO website, viewable at

https://www.renuzit.com/products/scented-oils, includes the following narration:

> *Scented oils are great for adding fragrance to your home, but frustrating, because you're limited to refill fragrances that fit your warmer brand – until now. Renuzit Scented Oils give you the freedom to find a new fragrance you love, without the extra investment of a new warmer. Our oil refills fit three of the top brands. So whether you're filling a Renuzit warmer, a Glade® warmer, or an Airwick® warmer, you can still try our new Sensitive Scents scented oils, or any of our home-enhancing fragrances and find the perfect fragrance fit for every room in your home. Renuzit Scented Oils. The perfect fit.*

*Oils,* Renuzit, https://www.renuzit.com/products/scented-oils (last visited March 13, 2019);

(Compl. ¶ 25a.) The video shows a consumer trying and failing to fit a Glade® fragrance bottle

refill into an Airwick® warmer:



As the narrator states that Renuzit® oil refills fit "three of the top brands," the ad displays a

lineup of warmers that includes one of SCJ's Glade® products:



The ad then shows a consumer inserting a Renuzit® oil refill into each of a Renuzit® warmer, a Glade® warmer, and an Air Wick® warmer (Glade® warmer pictured below):



*Oils*, Renuzit, https://www.renuzit.com/products/scented-oils (last visited March 13, 2019).

Similar messages are conveyed in Defendant's other advertising, as well as on the packaging of the products themselves. Defendant's website explicitly states that "Renuzit Plug-In Refills universally fit in any Glade® or Air Wick® oil warming unit":

> Connect with the warming aromas of Renuzit Scented Oils. Instantly transform any ordinary outlet with this alluring aromatic that won't cramp your style. Renuzit Plug-In Refills universally fit in any <u>Glade® or Air Wick® oil warming unit.</u>*

*Id.* (Compl. ¶ 25b.)  A recent free-standing insert (FSI) advertisement, published on or about the week of February 11, 2019, likewise claims that Renuzit® refills fit into Glade® scented warmers:



(Compl. ¶ 25c; *see also* Compl. Ex. A.)  Even the product packaging makes "universal refill" claims (visible at the top right of each packaging sample below) and mentions Glade® by name:

 

(Compl. ¶ 26; *see also* Compl. Ex. A.)

However, the problem with Defendant's ad campaign is that Renuzit® Plug-In Refills do not actually fit SCJ's Glade® reusable warmers. (Compl. ¶ 29; Kowalski Aff. ¶¶ 12-13.) SCJ has tested Renuzit® Plug-In Refills with two versions of its Glade® PlugIns® warmer – the one currently on the market, which was introduced in January of 2019, and the one preceding, which was introduced in 2012 – and the Renuzit® oil refill does not fit either. (Kowalski Aff. ¶¶ 4-5, 11-13; Compl. ¶¶ 30-35.) In fact, the only Glade® warmer that the Renuzit® oil refill *does* fit is the warmer that SCJ last offered for sale in the United States seven years ago. Thus, Defendant's claims that Renuzit® Plug-In Refills fit Glade® warmers are false – which necessarily makes their claims of "*universal* fit" false, as well.

SCJ has provided notice to Defendant of its intent to move for emergency injunctive relief. However, given the strong likelihood of immediate, irreparable harm, SCJ requests that this Court first enter a temporary restraining order precluding Defendant from continuing to

make these false and misleading claims. SCJ further requests that the Court set this matter to be briefed and, if necessary, to be heard, as soon as reasonably practicable, and that a preliminary injunction be entered pending a final resolution of this case.

## ANALYSIS

### I. Legal Standard

SCJ is seeking both a temporary restraining order to prevent immediate irreparable harm and, once the Court has had the opportunity to hold a hearing, a preliminary injunction pending resolution of this case on the merits. "To win a preliminary injunction, the moving party must establish that (1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018) [hereinafter *Eli Lilly II*]; *see also N. Star Indus., Inc. v. Douglas Dynamics LLC*, 848 F. Supp. 2d 934, 945 (E.D. Wis. 2012). Likelihood of success on the merits and irreparable harm are "interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *N. Star Indus.*, 848 F. Supp. 2d at 945. "In considering irreparable harm, the question is whether the party seeking relief will suffer irreparable harm in the interim period prior to the resolution of its claims."[2] *Id.*

If the moving party makes the preliminary showing of likelihood of success on the merits, irreparable harm, and inadequate remedies at law, "the court balances the harms to the moving party, other parties, and the public." *Eli Lilly II*, 893 F.3d at 381.

---

[2] To issue a temporary restraining order without providing the opposing party the opportunity to be heard, the movant must state "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

## II.    SCJ has shown a likelihood of success on the merits of its claims.

### A.  SCJ is likely to succeed on its Lanham Act claim.

The Lanham Act, 15 U.S.C. § 1125(a)(1)(B), provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

This provision prohibits not only statements that are literally false but also statements that "may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).

Generally,

> [t]o establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Id.* at 819; *see also N. Star Indus.*, 848 F. Supp. 2d at 945-46.  In this case, all five elements are unquestionably met.

### i.    Defendant's commercial advertisements falsely state that its Renuzit® Plug-In Refills (1) have a "universal fit" and (2) fit SCJ's Glade® warmers.

The first element of a Lanham Act false advertising claim requires a showing that the defendant has made a false statement of fact in a commercial advertisement about its own or

another's product.  As noted above, "[t]he false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *N. Star Indus.*, 848 F. Supp. 2d at 946 (citing *Hot Wax*, 191 F.3d at 820).

In determining whether a statement is literally false, "[t]he inquiry asks whether the defendant made an explicit representation of fact that on its face conflicts with reality." *Eli Lilly II*, 893 F.3d at 382.  Such statements "necessarily deceive consumers, so extrinsic evidence of actual consumer confusion is not required." *Id.*  The Seventh Circuit provided an example of a literally false statement in *Eli Lilly II*, a recent false advertising case.  *Eli Lilly II* addressed the defendant Arla's "Live Unprocessed" ad campaign, which was focused on expanding Arla's cheese sales in the U.S.  *Id.* at 379.  "[I]f Arla's television commercial had said, 'drinking milk from cows treated with rbST gravely endangers your health,'" the Court explained, "Elanco would need no additional evidence of consumer confusion to prevail on its claim." *Id.*

In contrast, statements that are literally true or ambiguous are still actionable under the Lanham Act so long as the plaintiff can show that the statement is "misleading in context," *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994) (citation omitted) – that is, that it "has 'the tendency to deceive a substantial segment of its audience.'" *Eli Lilly II*, 893 F.3d at 382 (quoting *Hot Wax*, 191 F.3d at 819-20).  Again using *Eli Lilly II* as an example, in that case, though Arla had made no explicit false statements about the composition of milk from rbST-treated cows, *id.* at 382, its ad campaign nevertheless "center[ed] on disparaging dairy products made from milk supplied by rbST-treated cows" through "[t]he use of monster imagery, 'weird stuff' language, and child actors [that] combine[d] to colorfully communicate the message

that responsible consumers should be concerned about rbST-derived dairy products." *Id.* at 382-83. Thus, its campaign, though not literally false, was nevertheless "likely to mislead consumers about the wholesomeness of products made from milk supplied by rbST-treated cows." *Id.* at 383.

Here, Defendant's entire campaign is premised on the notion of "universal fit" – that is, that its new Renuzit® Plug-In Refills fit into, and can be used with, other companies' warmers, including Glade® PlugIns®. However, those statements are literally false or, at a minimum, misleading.

### 1. Defendant's "universal fit" statements are literally false.

Defendant has made repeated claims – in its print ads, on its product packaging, in its video ads – that the Renuzit® Plug-In Refills have a universal fit, and that they specifically fit into Glade® warmers. But it is the work of only a moment to conclusively demonstrate that those claims are "an explicit representation of fact that on [their] face conflict[] with reality." *Eli Lilly II*, 893 F.3d at 382.

SCJ currently offers one Glade® warmer for sale: the version introduced into the market in January of 2019 (the "2019 Warmer"). (Kowalski Aff. ¶ 4.) Prior to the introduction of the 2019 Warmer, SCJ marketed and sold a Glade® warmer that was first introduced in 2012 and was sold until January 2019 (the "2012 Warmer"). (Kowalski Aff. ¶ 5.) Before the introduction of the 2012 warmer, SCJ offered a Glade® warmer that was first introduced in 2004, and was last sold in the United States in 2012. (Kowalski Aff. ¶ 6.) Renuzit® Plug-In Refills do not "fit" either the 2012 Warmer, or the 2019 Warmer.

As a preliminary matter, SCJ anticipates that Defendant may argue its Renuzit® Plug-In Refills "fit" Glade® warmers insofar as they can actually be forcibly inserted into the

discontinued 2012 Warmers (despite the misalignment of the wick and heater discussed *infra*). Even if that interpretation is arguably possible, it is not a reasonable gloss on the terms "fit" and "universal fit." "[A] statement may be classified as literally false if although it is a true statement on its face, it 'means something different from what reasonable consumers would understand it to mean.'" 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:54 (5th ed.), Westlaw (database updated Nov. 2018) (quoting *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 66 (2d Cir. 2016) (footnote omitted)).  Here, the word "fit" means something more than "physically capable of being joined together."  (A pair of shoes several sizes too big could physically be worn, for example, but no one could reasonably claim that they "fit.")  Rather, the word "fit" in this context communicates to any reasonable consumer that the items in question are *adapted to* or *compatible with* one another, so that the consumer may use them as intended.

Thus, although the Renuzit® Plug-In Refill can physically be forced into the Glade® 2012 Warmer, no reasonable consumer would believe that the Renuzit® product "fits" that warmer, because it *will not actually function* under those circumstances.  The context of the ads and the market supports this interpretation.  *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009) ("meaning of the alleged literal falsehood must be considered in context and with reference to the audience to which the statement is addressed").  The video on Defendant's website, for instance, speaks of trying a new scent without investing in a new warmer, which is only possible if the Renuzit® oil bottle actually *works* with the customer's other-branded warmer. Dictionary definitions further support this common-sense interpretation of Defendant's claims.  *See, e.g.*, Fit, Merriam-Webster, https://www.merriam-webster.com/dictionary/fit (last visited March 13, 2019) (entry 4,

definition 1a: " to be suitable for or to: harmonize with"; definition 2a: "to conform correctly to the shape or size of"); Fit, Dictionary.com, https://www.dictionary.com/browse/fit (last visited March 13, 2019) (definition 7: "to be adapted to or suitable for"; definition 9: "to be of the right size or shape for").

Interpreting "fit" as a reasonable consumer would, it is apparent that Defendant's ads "conflict[] with reality" and are therefore literally false. *Eli Lilly II*, 893 F.3d at 382. Considering the 2012 Warmer first, SCJ's tests show that while the Renuzit® bottle can be forced into the warmer, it does not sit flush against the warmer (Kowalski Aff. ¶ 12):



This is more than a mere cosmetic problem. Because the Renuzit® bottle does not fit properly in the 2012 Warmer, the wick of the bottle is not properly aligned with the warmer's ceramic heater. (Kowalski Aff. ¶ 12.) This results in a severely limited heat transfer from the

heater to the wick – which means that the product will function poorly at best, and may not emit fragrance at all. (Kowalski Aff. ¶ 12.) Below is a photograph of two 2012 Warmers: the left with a Renuzit® Plug-In Refill inserted, and the right with a Glade® refill bottle inserted. Portions of the warmer have been cut away to show the alignment of the wick with the heater element:



The Renuzit® bottle's wick barely reaches the bottom of the ceramic heater; in contrast, the entire wick of the Glade® bottle sits flush against the ceramic heater, which is required for the heater to warm the scented oil and cause the product to emit fragrance. The 2012 Warmer cannot fulfill this function with respect to the Renuzit® oil refill bottle, given the wick's misalignment. (*See* Kowalski Aff. ¶ 12.) Thus, it cannot credibly be claimed that the Renuzit® bottle "fits" the 2012 Warmer.

The Renuzit® Plug-In Refill fares no better when inserted into the 2019 Warmer – in fact, it fares worse. Though the bottle has a small protrusion apparently intended to snap into a warmer unit, it does not fit properly in that warmer:



More importantly, however, the 2019 Warmer does not retain the Renuzit® bottle; if inserted in the manner shown above, the bottle will simply fall out. (Kowalski Aff. ¶ 13.) SCJ's analysts believe that it is possible the bottle could be forced to stay in the 2019 Warmer, but the amount of physical force required would very likely damage either the warmer or the refill bottle. (Kowalski Aff. ¶ 14.) The warmer might fail – or, more likely, the bottle would leak, spilling the scented oil.

Even assuming that the Renuzit® bottle could somehow be retained in the 2019 Warmer without damage to either component product, SCJ's analysis clearly demonstrates that the 2019 Warmer would not function *at all* when loaded with a Renuzit® Plug-In Refill. When portions of the 2019 Warmer are cut away, it is clear that the wick of the Renuzit® bottle is nowhere

close to the ceramic heater (in the photo below, the ceramic heater is just visible at the top of the hole cut in the 2019 Warmer):



Thus, the oil would not properly heat, and the product would not function.  (Kowalski Aff. ¶ 15.)

It is clear, then, that the Renuzit® Plug-In Refill does not "fit" either the 2012 Warmer or the 2019 Warmer.  Defendant's claims of "universal fit" are thus literally false, as are their claims that the Renuzit® Plug-In Refill fits Glade® warmers, specifically: they expressly communicate that Defendant's product has qualities that it does not actually have.  *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13-14 (7th Cir. 1992) (statement that a solution was "rice-based" was literally false where "rice-based" was "a term of art used to describe oral electrolyte solutions made from rice grain powder," but product did not actually contain powdered whole rice).  Claims that a product is compatible with a competitor's product, when the products are not in fact compatible, have been held to support liability for false advertising under the Lanham Act—even where combining the products is physically possible.  *See EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 738, 740 (8th Cir. 2000) (affirming liability where defendant advertised its

products as "compatible and interchangeable with EFCO's products," but evidence showed that it was "hazardous to commingle the two products" because of different load-bearing capabilities).

By presenting photographs showing the misalignment of the Renuzit® oil refill in the Glade® warmer, SCJ has presented sufficient evidence of the falsity of Defendants' claims. *Northern Star* is instructive on this point. In *Northern Star*, the defendant, Douglas Dynamics, created an ad campaign for its snowplows that was focused on safety; its ads centered on a contention that Northern Star's trip-blade snowplows could not "trip" when they were positioned in certain modes. (A snowplow blade "trips" by folding forward when it encounters an obstacle.) *N. Star Indus.*, 848 F. Supp. 2d at 938. Douglas made various claims about Northern Star's blades that focused on their inability to "trip"; for instance, in one video, a narrator discussing a Northern Star blade claimed that, "When plowing in vee or scoop mode, it cannot trip." *Id.* at 941-42. Douglas's ad also included footage of a Northern Star blade tripping – but not clearing – hidden obstacles. *Id.* However, Douglas actually had raw video showing that Northern Star blades *did* trip and clear the obstacles in three out of its four tests, and Northern Star likewise produced video showing its blades tripping and clearing obstacles in scoop and V-mode. *Id.* at 946. Accordingly, this Court held that Douglas's "unqualified" statements that the Northern Star blades "cannot trip" in V- and scoop mode were literally false. *Id.* at 947.

Here, too, Defendant has made false claims about the qualities of its Renuzit® Plug-In Refills. It claims they (1) feature a "universal fit," and (2) fit Glade® warmers, specifically. As shown in the photographs above, neither claim is true. Accordingly, SCJ is likely to succeed in showing that Defendant has made claims that, under the Lanham Act, are literally false.

## 2.   In the alternative, the "universal fit" claims are misleading.

To the extent that Defendant argues its Renuzit® Plug-In Refills "fit" Glade® warmers because they can be forced into the warmers (albeit in a misaligned fashion that keeps them from functioning), SCJ disagrees.  Its claims of "universal fit" are in large part unqualified, meaning that at a minimum those claims are literally false with respect to the 2019 Warmer.[3]  Its claims that the bottles fit "Glade® warmers," again without qualification, are literally false with respect to the 2019 Warmer as well.  However, if the Court disagrees that some of all of Defendant's various formulations on its "universal fit" claims are literally false, SCJ respectfully submits that they are, at a minimum, misleading.

As discussed above, the word "fit" connotes a compatibility between products that is clearly lacking here.  *See* Section 2.A.i.1, *supra*. Even if the Court concludes that the Renuzit® Plug-In Refills literally "fit" *some* Glade® warmers because they can be physically maneuvered into and retained within certain of Glade®'s discontinued 2012 Warmers, the overall message conveyed by Defendant's advertising is not just one of physical fit but functional compatibility across *all of Glade®'s warmer products* (hence the modifier "universal").  *See id.*  For all the reasons discussed previously, Defendant's ads are, at the very least, misleading due to the

---

[3] SCJ is aware that on the back of some of its packaging, Defendant has partially qualified certain of its statements by listing Glade® model numbers with which its product is compatible.  (*See* Kowalski Aff. ¶ 16.)  However, that does not change the overall analysis in this case, for several reasons.  First: while some of its advertising claims are qualified in this way, many are not.  The video available on Defendant's website, for instance, directs customers to the Renuzit® website for "fit information"; the website, in turn, states that Renuzit® Plug-In Refills "universally fit in any Glade® or Air Wick® oil warming unit," *see Oils*, Renuzit, https://www.renuzit.com/products/scented-oils (last visited March 13, 2019), and the FAQs page further states that "Renuzit Oil Refills can be used in Glade® , Air Wick® , and Renuzit Scented Oil plug-in," without qualification.  *See FAQs*, Renuzit, https://www.renuzit.com/faqs#oils (last visited March 13, 2019).  Second: the list of model numbers appears in tiny print on the back of the package, has little, if any, meaning to an ordinary consumer, and does not adequately communicate to consumers which Glade® units the Renuzit® refill will fit.  *See Eli Lilly II*, 893 F.3d at 383 (ads did not provide "needed context" where disclaimer appeared in ad campaign, "but only in tiny print in the television commercial and in an obscure location on the webpage").  Third: the list includes the 2012 Warmer; as explained herein, the Renuzit® Plug-In Refill does not fit in the 2012 Warmer.  (*See* Kowalski Aff. ¶ 16.)  And fourth, even with the packaging qualifier, the use of the terms "universal fit" and "universal refill" are misleading, because something that is "universal" is by definition unlimited in scope.

message they convey, and they satisfy SCJ's burden to demonstrate it is likely to succeed in proving the first element of its Lanham Act claim.

>    ii.    **Defendant's false and misleading statements actually deceive or have a tendency to deceive a substantial segment of their audience.**

The second element of Lanham Act false advertising claims is closely connected to the first: a plaintiff must show the challenged statements actually deceive, or have a tendency to deceive, a substantial segment of their audience.

As discussed above, SCJ maintains that Defendant's claims are literally false. Independent proof of actual deceit is not required for literally false claims. *See, e.g.*, *Eli Lilly II*, 893 F.3d at 382 ("A literally false statement will necessarily deceive consumers, so extrinsic evidence of actual consumer confusion is not required."); *N. Star Indus.*, 848 F. Supp. 2d at 947 (where statement was literally false, plaintiff did not need to "present actual evidence of consumer confusion").

If, however, the Court finds Defendant's claims are likely merely misleading, this second element is nevertheless met, because the ads have a tendency to deceive a substantial segment of their audience. For statements that fall into the ambiguous-but-misleading category, a plaintiff must produce evidence of actual consumer confusion "in order to carry its burden to show that the challenged statement has 'the tendency to deceive a substantial segment of its audience.'" *Eli Lilly II*, 893 F.3d at 382 (quoting *Hot Wax*, 191 F.3d at 819-20). Ordinarily, at trial, that evidence takes the form of consumer surveys. *Id.* However, the Seventh Circuit has made clear that "such proofs are not required at the preliminary injunction stage." *Id.* (quoting *Abbott Labs.*, 971 F.2d at 15). Accordingly, as in *Eli Lilly II*, it is appropriate for this Court to look to the content of the advertisements themselves, as well as other supporting evidence, to determine

whether it is likely that the advertisements will have a tendency to deceive a substantial segment of their audience.

Consumers who hear that a product has a "universal fit" and that it "fits" Glade® warmers will not hear those statements as speaking purely to the possibility of physically inserting the refill bottle into the warmer. They will hear them as assurances that the Renuzit® refill bottles will *work* with their warmers, whatever the brand, and whatever the iteration – including Glade® warmers, which are specifically mentioned by name, whether they own the version introduced in 2012 or 2019. Defendant's ads further strengthen that impression by emphasizing that their product will allow consumers to try new scents without having to invest in a new warmer; that necessarily implies that inserting a Renuzit® Plug-In Refill into a Glade® warmer will result in a functional product.

Thus, even if Defendant's ads are arguably literally true, they are clearly intended to communicate to consumers that Renuzit® Plug-In Refills actually *work* in conjunction with all other warmers, including Glade®. That message is not true, making Defendant's advertising misleading. *Cf. Eli Lilly II*, 893 F.3d at 383 (evidence of advertisements themselves was sufficient to "communicate the message that responsible consumers should be concerned about rbST-derived dairy products," and "judge reasonably concluded that these ads are likely to mislead consumers about the wholesomeness of products made from milk supplied by rbST-treated cows"). At the preliminary relief stage, this is all that is required.

>    iii.    **The statements are material in that they are likely to affect purchasing decisions.**

The third element of a Lanham Act false advertising claim requires SCJ to show that the "deception is material, in that it is likely to influence the purchasing decision." *Hot Wax*, 191 F.3d at 819. Importantly, "courts generally only require a *likely*, as opposed to an *actual*, effect

on consumer choice." *e-ImageData Corp. v. Dig. Check Corp.*, No. 15-cv-658, 2018 WL 1411226, at *3 (E.D. Wis. Mar. 21, 2018). Factors that may bear on the materiality inquiry include the importance of the product feature misrepresented and how a misrepresentation is used. *Id.* at *4 (citing Vincent N. Palladino, *Lanham Act "False Advertising" Claims: What is a Plaintiff To Do?*, 101 Trademark Rep. 1601, 1626-32 (2011)).

Here, Defendant's false advertising is highly likely to affect consumers' purchasing decisions. As Defendant's own advertisements acknowledge, SCJ's Glade® product is one of the leading brands in the PISO market. Because it is standard in the PISO market for reusable warmers to function best with oil refills of the same brand, customers who currently have Glade® warmers are likely to purchase a Glade® refill when it comes time to replace the fragrance bottle. After learning that Defendant's Renuzit® Plug-In Refills supposedly have a "universal fit," however, consumers will view that product as a viable alternative. Said another way, Defendant's deceptive advertising goes to the most basic quality of a PISO refill product: how it functions with the customer's warming device. This is unquestionably material under Lanham Act standards.

Moreover, Defendant unquestionably intends its advertisements to induce consumers to purchase the Renuzit® Plug-In Refill and has disseminated them accordingly; this is not a case in which the advertisements in question are only available to consumers post-purchase (e.g., on the inside of the product's packaging), nor is this a market in which traditional forms of advertising do not affect consumers' purchasing decisions. *Cf.* Palladino, *supra*, at 1629 n.110 (collecting cases in which advertisements were available to consumers only after purchase or where they were otherwise shown not to affect purchasing decisions).

Defendant's deceptive claims are central to the forces that drive consumers' purchases in this market.  Accordingly, they are "material" within the meaning of the Lanham Act, and SCJ has satisfied its burden to show it is likely to succeed on this element of its claim.

### iv.     Defendant has caused the statements to enter interstate commerce.

The fourth element requires that Defendant has introduced its false statements into interstate commerce.  In this case, that element is not at issue: Defendant has advertised its Renuzit® Plug-In Refills in interstate commerce via online ads, packaging, and print advertising.  Accordingly, SCJ is likely to succeed in proving this element of its claim as well.

### v.      SCJ has been injured by the false statements.

Finally, SCJ must show that it has been or is likely to be injured as a result of Defendant's false statements, *Eli Lilly II*, 893 F.3d at 382, "either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax*, 191 F.3d at 819.  The injury must be proximately caused by Defendant's misrepresentations. *e-ImageData Corp.*, 2018 WL 1411226, at *4 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1395 (2014)).  "In other words, 'a plaintiff suing under [§ 43(a)] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising,' which 'occurs when deception of consumers causes them to withhold trade from the plaintiff.'" *Id.* (quoting *Lexmark Int'l*, 134 S. Ct. at 1391).

There is no question that SCJ is likely to be injured by Defendant's false statements.  Those statements are *specifically intended* to lure SCJ's own customers away from Glade® products, inviting them to replace their Glade® refills with Renuzit.  (*See* Kowalski Aff. ¶ 17.) Though it is still too early to track actual diversion of sales, it is clear that these ads are highly likely to have that effect.  *See Eli Lilly & Co. v. Arla Foods Inc.*, No. 17-C-703, 2017 WL

4570547, at *9 (E.D. Wis. June 15, 2017) [hereinafter *Eli Lilly I*], (plaintiff presented evidence that "seemingly reveal[ed] that a major cheese producer is electing to terminate the use of rbST at least in part as a result of Arla's advertising"); *Eli Lilly II*, 893 F.3d at 384 (aforementioned evidence of single cheese producer's response to ad campaign was "sufficient factual support for the judge's decision to issue a preliminary injunction").

Moreover, loss of goodwill is also actionable under the Lanham Act. *Hot Wax*, 191 F.3d at 819. And in this case, the harm perpetrated by Defendant's false advertisements will not end when a customer purchases a Renuzit® refill instead of a Glade® refill for her Glade® PlugIn® product. (*See* Kowalski Aff. ¶ 18.) She will take that refill home – and will be unable to make it work in conjunction with her Glade® warmer. The bottle will not fit the 2019 Warmer at all, and if the customer tries, in reliance on Defendant's claims, she may damage her warmer, or break the oil refill bottle and cause leakage or spills. Her refill may be made to fit the 2012 Warmer, but as discussed above, it will not emit fragrance, which is the most basic function of the product. (Kowalski Aff. ¶ 18.) Perhaps the customer's frustrations will be directed at Renuzit, for providing what she may believe to be a weak or unsatisfactory scent – but they may also be directed at SCJ, and at the Glade® brand, for an apparently malfunctioning warmer. (The customer, after all, will not be able to see the misalignment of the ceramic heater and the wick, and thus may not understand that the Renuzit® Plug-In Refill does not actually "fit" the Glade® warmer.) (Kowalski Aff. ¶ 18.) She may return to Glade® refills after this experience – or she may purchase a Renuzit® warmer, which *will* function with the Renuzit® Plug-In Refill and will create the impression that it was SCJ's product, not Defendant's, that was failing to work as advertised. (Kowalski Aff. ¶ 19.) This possible loss of goodwill is of grave concern to SCJ and necessitates immediate injunctive relief.

"The Lanham Act does not protect sellers from competition from better or cheaper products, but it does protect sellers 'from having their customers lured away from them by deceptive ads.'" *Dyson, Inc. v. Sharkninja Operating LLC*, 259 F. Supp. 3d 816, 819 (N.D. Ill. 2017) (quoting *Schering-Plough*, 586 F.3d at 512). That is exactly what Defendant's ads are intended to do – and will do, unless it is immediately enjoined from its deceptive conduct. SCJ has accordingly met its burden at the preliminary injunctive stage, showing both economic and reputational injury that flows from Defendant's deceptive statements and representations.

### B. SCJ is also likely to succeed on the merits of its Wisconsin DTPA claim.

Given the substantial overlap in the merits of the Wisconsin DTPA and Lanham Act claims, SCJ's strong likelihood of success on the merits of its Lanham Act claims is alone sufficient to justify preliminary injunctive relief. *Cf. Eli Lilly II*, 893 F.3d at 382 n.2 ("Elanco's Lanham Act claim is the main event at this stage of the proceedings. The [Wisconsin] state-law claim is largely duplicative, so the judge didn't need to say much about it and neither do we."). Should the Court also wish to address the merits of the Wisconsin DTPA claim, however, SCJ submits that it is likely to succeed on that claim as well.

To prevail on a claim under the Wisconsin DTPA, SCJ must show that (1) Defendant made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) it caused SCJ a pecuniary loss. *Le Bleu Corp. v. Fed. Mfg. LLC*, No. 17-C-549, 2018 WL 4936032, at *10 (E.D. Wis. Oct. 10, 2018) (citing *K & S Tool & Die. Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶ 19, 301 Wis. 2d 109, 121-22, 732 N.W.2d 792). These elements correspond, substantively speaking, to the elements of a false advertising claim under the Lanham Act. *See, e.g.*, *Tim Torres Enters., Inc. v. Linscott*, 142 Wis. 2d 56, 66, 416 N.W.2d 670 (Ct. App. 1987) (analyzing whether statements were untrue, deceptive or misleading with reference to Lanham Act); *Bemis Mfg. Co. v. Centoco*

*Plastics Ltd.*, No. 08-C-402, 2009 WL 10675768, at *6 (E.D. Wis. Mar. 2, 2009) (denying motion to dismiss section 100.18 claim for reasons "discussed in the context of the Bemis' Lanham Act claims").

As already discussed, Defendant has made numerous representations to the public in its ads, which are clearly intended to induce the public to purchase Renuzit® Plug-In Refills. Those representations are literally false, or at the least misleading. And SCJ is highly likely to suffer harm in the form of diverted sales as well as a loss of consumer goodwill. Accordingly, SCJ is likely to succeed on the merits of this claim as well.[4]

### III. SCJ has demonstrated the likelihood of irreparable harm and an inadequate remedy at law.

"Injuries arising from Lanham Act violations are presumed to be irreparable." *Eli Lilly I*, 2017 WL 4570547, at *10; *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992); *N. Star Indus.*, 848 F. Supp. 2d at 949 ("It is well settled that injuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss."). "This presumption, it appears, is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *N. Star Indus.*, 848 F. Supp. 2d at 949 (quoting *Abbott Labs.*, 971 F.2d at 16). This presumption remains good law in the Seventh

---

[4] SCJ recognizes that there is disagreement as to whether a competitor is an appropriate party to bring a Wisconsin DTPA claim. *See, e.g.*, *Grice Eng'g, Inc. v. JG Innovations Inc.*, 691 F. Supp. 2d 915, 923 (W.D. Wis. 2010) (finding statute is "not designed to protect product manufacturers from the deceptive acts of their competitors"). The Court need not rule on this question at present, but it is SCJ's position that Wisconsin law supports the availability of such claims. *See* Wis. Stat. § 100.18(11)(b)2. (providing that "[a]ny person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction . . . ."); *Tim Torres*, 142 Wis. 2d 56 (upholding jury verdict of liability in § 100.18 suit between competitors, based on evidence that "contrary to reasonable expectations, there was a decrease in [plaintiff's] anticipated sales"). *But see SportPet Designs Inc. v. Cat1st Corp.*, No. 17-CV-0554, 2018 WL 1157925, at *7 (E.D. Wis. Mar. 2, 2018) (noting that the DTPA "generally" did not apply where plaintiff sustained losses as "commercial competitor" but failing to discuss *Tim Torres*).

Circuit. *E.g., Eli Lilly I*, 2017 WL 4570547, at *10 (applying presumption)[5]; *see also H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1050 (E.D. Wis. 2018) ("[B]ecause of the difficulty in quantifying damage to the reputation or goodwill of a mark holder, courts presume irreparable harm and the inadequacy of legal remedies in Lanham Act cases.").

To the extent that Defendant argues SCJ delayed in seeking preliminary injunctive relief and thereby undercut the presumption of irreparable harm, that argument has no merit. It is true that under certain circumstances, "[d]elay in pursuing injunctive relief may raise questions regarding a plaintiff's claim that it will face irreparable harm if a preliminary injunction is not entered." *N. Star Indus.*, 848 F. Supp. 2d at 949. However, in this case, SCJ has moved promptly for relief upon its discovery of Defendant's false advertising. It has been only about two months since the product was introduced into the market, and SCJ acquired samples within a week. The advertising that SCJ challenges is newer still: the FSI referenced above, for instance, was published just one month ago. SCJ has acted quickly to acquire samples of the Renuzit® units, test them in its own warmers, confirm the falsity of Defendant's advertising, and move for relief. There is no delay here that undercuts the presumption of irreparable harm.

Furthermore, both this Court and the Seventh Circuit have rejected the notion that mere delay, standing on its own, can rebut the presumption of irreparable harm caused by a Lanham

---

[5] Even if this Court were to decline to apply the presumption in the wake of the Supreme Court's decision in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), which eliminated the presumption in *patent* cases, the likelihood of irreparable harm here is very great, as the false statements in Defendant's advertising are clearly intended to divert SCJ's sales toward Defendant, and do so in a manner that may well cause consumers to blame *SCJ* for the products' failure to function. *See, e.g., Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014) (irreparable harm supported "not by a general rule or presumption but by the literally false comparative advertising claims at issue, the competitive relationship between the parties and products, and the judgment of [the marketing director] that the harm to SEB's brand reputation and goodwill is impossible to quantify"); *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *23 (N.D. Ill. June 12, 2015) (noting that courts continue to apply a presumption of irreparable injury from Lanham Act cases in the wake of *eBay* but analyzing the case on its individual facts "out of an abundance of caution" and concluding that irreparable harm existed).

Act violation.  Rather, Defendant would need to show that any delay on SCJ's part in seeking a preliminary injunction lulled it into a false sense of security, thereby causing it harm.  In *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001), the Seventh Circuit applied this principle in the context of a trademark infringement claim under the Lanham Act.  The plaintiff, Ty, Inc., had initially sent a cease and desist letter in July 1997 to the defendant; it was not until November 17, 1999, that Ty eventually requested a preliminary injunction.  *Id.* at 895.  The court granted that injunction, and the Seventh Circuit affirmed.  Rejecting the defendant's argument that Ty's delay showed there was no threat of irreparable injury, the Seventh Circuit stated: "Whether the defendant has been 'lulled into a false sense of security or had acted in reliance on the plaintiff's delay' influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not."  *Id.* at 903.  Because Jones did not present any evidence to that effect, the Seventh Circuit concluded that the magistrate judge had "properly decided that the evidence of mere delay alone, without any explanation on Jones' part of why such a delay negatively affected them, would not lessen Ty's claim of irreparable injury."  *Id.*

More recently, this Court applied those same principles in a Lanham Act false advertising case in *Northern Star Industries, Inc. v. Douglas Dynamics LLC*, 848 F. Supp. 2d 934 (E.D. Wis. 2012).  In *Northern Star*, the plaintiff became aware of the problematic ad campaign "as early as July 18, 2011."  *Id.* at 949.  It sent a cease and desist letter more than two months later, on September 30, 2011, giving Douglas Dynamics just two days to stop using the ads in question – but then "did nothing when Dynamics took no action and the deadline passed."  *Id.*  It was not until October 21, 2011 that Douglas Dynamics responded, acceding to some but not all of Northern Star's demands.  Northern Star waited 20 days to respond, then an additional month to file suit seeking a preliminary injunction.  *Id.*

This Court recognized that "[s]everal district court decisions view a plaintiff's delay in requesting injunctive relief negatively." *Id.* However, citing to *Ty, Inc.*, it pointed out that Douglas Dynamics had "presented no affirmative evidence that Northern Star's delay in seeking a preliminary injunction caused Dynamics to be lulled into a false sense of security or that Dynamics in any way relied on Northern Star's delay." *Id.* at 950 (citing *Ty, Inc.*, 237 F.3d at 903). "Therefore, mere evidence of delay without any explanation on Dynamics' part of why such a delay negatively affected it, would not lessen Northern Star's claim of irreparable injury." *Id.* (citing *Ty, Inc.*, 237 F.3d at 903).

The reasoning of *Ty, Inc.* and *Northern Star Industries* applies with equal force to this case. Here, Defendant cannot show that it has been negatively affected by the minimal passage of time between its introduction of its "universal fit" claims and SCJ's motion for a temporary restraining order and preliminary injunction. Accordingly, to the extent that Defendant attempts to argue that a preliminary injunction is inappropriate due to the mere fact of delay, that argument does not lessen the presumption of irreparable injury that stems from Defendant's Lanham Act violation. *See Ty, Inc.*, 237 F.3d at 903; *N. Star Indus.*, 848 F. Supp. 2d at 950.

The damage to SCJ's customer goodwill and market share are immediate and irreparable. Indeed, SCJ's customers may *already* be relying upon Defendant's "universal fit" claims in deciding to purchase and try a Renuzit® Plug-In Refill in their Glade® PlugIns® warmer. When that attempt fails, SCJ will have lost not only a sale, but also the goodwill of an SCJ customer. Accordingly, both a TRO and preliminary injunction are warranted here. *See Ne. Lumber Mfrs. Ass'n v. J.P.R.S./New Way, Inc.*, No. 10-C-0403, 2010 WL 1961458, at *1 (E.D. Wis. May 14, 2010) (temporary restraining order warranted where defendant's actions were "likely to cause irreparable harm in the form of damage to the value of plaintiff's [trade]marks").

## IV. The balance of harms favors SCJ.

Because SCJ has established that it is likely to succeed on the merits of its claims and that it will suffer irreparable harm in the absence of preliminary relief, the Court next balances that irreparable harm against any harm that Defendant would suffer as a result of the entry of a preliminary injunction. *See N. Star Indus.*, 848 F. Supp. 2d at 950. In this case, the harm that SCJ will suffer to its reputation and market position if Defendant is permitted to continue disseminating its false statements substantially outweighs the harm Defendant will incur by altering or ceasing to employ the deceptive portions of its advertisements pending a final adjudication on the merits. Defendant can easily, and with minimal expense, alter the text on its website and cease to include the claims of "universal fit" on its FSI materials and other print advertising. Altering the product packaging will be slightly more expensive but necessary, particularly given that consumers may well enter a store intending to purchase a Glade® refill, see the "universal fit" statements on Defendant's packaging, and, under the mistaken impression that Defendant's product will work in conjunction with their Glade® warmer, leave the store with a Renuzit® Plug-In Refill. Moreover, Defendant will be free to continue to sell its own warmers, and warmer-oil combinations; SCJ does not seek to preclude Defendant from entering the PISO market altogether, only to prevent it from doing so via a campaign that falsely represents the character and quality of its refill products. Finally, Defendant can continue to use any advertising materials that do not include the false or misleading claims. *See Eli Lilly I*, 2017 WL 4570547, at *10 (balance of hardships weighed in favor of preliminary injunction where injunction "would not enjoin Arla from using the entirety of its 'Live Unprocessed' advertising campaign" but "would only be enjoined from using materials in the campaign that make false or misleading statements").

When contrasted with the irreparable harm facing SCJ, the balance of harms weighs heavily in favor of preliminary relief.  *See id.*; *N. Star Indus.*, 848 F. Supp. 2d at 950 ("[T]his Court has concluded that Northern Star is likely to succeed in proving that two claims promoted by that campaign are false.  The harm to Northern Star exceeds any harm to Dynamics.").

V.      **Preventing false and misleading advertisements is in service of the public interest.**

The final factor asks whether the entry of a preliminary injunction would serve the public interest.  In this case, that factor unquestionably weighs in favor of the entry of a preliminary injunction.  SCJ has shown that it is likely to succeed in showing that Defendant has relied upon false and misleading representations in its commercial advertising and that those statements (1) actually deceive or have a tendency to deceive consumers, and (2) they are likely to influence consumers' purchasing decisions.  An injunction will thus serve the public interest by protecting consumers from confusion and from basing their purchases on false and misleading statements. *See N. Star Indus.*, 848 F. Supp. 2d at 950; *see also Abbott Labs.*, 971 F.2d at 19 (noting that "the public interest in truthful advertising" is "an interest that lies at the heart of the Lanham Act"); *Generac Power Sys., Inc. v. Kohler Co.*, No. 12-C-66, 2013 WL 238843, at *3 (E.D. Wis. Jan. 22, 2013) ("[I]t is always in the public's interest to have the truth rather tha[n] falsehoods injected into the stream of commerce.").

**CONCLUSION**

Defendant has attributed to its Renuzit® Plug-In Refills a quality that they simply do not have: the quality of universal fit.  That advertising is intended to divert sales from established participants in the PISO market like SCJ to Defendant, by telling SCJ's customers that even though they have Glade® warmers at home, they can switch to Renuzit® refills with no added costs.  But these statements are false: Renuzit® Plug-In Refills neither fit into nor work with

SCJ's 2019 Warmer or 2012 Warmer. Consumers who see Defendant's advertising will thus direct their sales toward Defendant – and, ultimately, their frustration toward SCJ.

The harm from Defendant's false advertising is irreparable and cannot be compensated via money damages, and it vastly outweighs the relatively minimal harm Defendant may suffer from an injunction prohibiting it from employing the false and misleading portions of its ad campaign. Accordingly, SCJ respectfully requests that this Court enter a temporary restraining order and preliminary injunction, substantially in the form attached hereto, to prevent future irreparable harm and deception of consumers pending a final resolution of this matter.

Dated this 13th day of March, 2019.

s/Monica A. Mark
Jessica H. Polakowski
WI State Bar ID No. 1061368
jpolakowski@reinhartlaw.com
Monica A. Mark
WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Andrea M. Davenport
WI State Bar ID No. 1088374
adavenport@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
P.O. Box 2018
Madison, WI 53701-2018
Telephone: 608-229-2200
Facsimile: 608-229-2100

*Attorneys for Plaintiff, S.C. Johnson & Son, Inc.*

**CERTIFICATION**

I, Jessica Hutson Polakowski, hereby certify that I spoke with Henkel's Assistant General Counsel, Lauren J. Mandell, on March 13, 2019 and provided notice of the filing of this action. Concurrently with this filing, we are providing Attorney Mandell a copy of all filings in this matter to date.

Dated this 13th day of March, 2019.

s/Jessica H. Polakowski
Jessica H. Polakowski
WI State Bar ID No. 1061368
jpolakowski@reinhartlaw.com
Monica A. Mark
WI State Bar ID No. 1082428
mmark@reinhartlaw.com
Andrea M. Davenport
WI State Bar ID No. 1088374
adavenport@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
P.O. Box 2018
Madison, WI 53701-2018
Telephone: 608-229-2200
Facsimile: 608-229-2100